RICE v. RICE.

Divorce—Extreme Cruelty—Where Both Guilty Neither Entitled to Decree.

Where, in husband's bill and wife's cross-bill for divorce, each alleged extreme cruelty, and the record shows that both were at fault and each inclined to exaggerate the faults of the other, neither is entitled to a decree, since the court may not adopt any rule of comparative extreme cruelty.

Appeal from Kent; Brown (William B.), J. Submitted April 8, 1927. (Docket No. 65.) Decided July 29, 1927.

Bill by William Rice against Euphemia Rice for a divorce. Defendant filed a cross-bill for a divorce.

Divorce, 19 C. J. § 367.

From a decree for defendant, plaintiff appeals. Reversed, and bill and cross-bill dismissed.

*Irving H. Smith,* for plaintiff.

STEERE, J. Plaintiff appeals from a decree by the circuit court of Kent county, in chancery, granting defendant a divorce from him on her cross-bill, with $32 per month alimony. The case was heard and decree rendered on September 10, 1926. He was then in his 81st year and she was "about 73." Plaintiff's bill for divorce was filed April 21, 1926, charging extreme cruelty to which she answered in denial with cross-bill asking a decree to her on the ground of extreme cruelty and failure to support, which he duly answered in denial.

The parties were married February 10, 1924, at South Haven, Michigan, where defendant resided. No issue was born of their marriage. Both had then passed the allotted age of three score and ten. Each had previously been married and long survived a former spouse. Plaintiff was an accredited inmate of the Soldiers' Home at Grand Rapids, where he stated he lived about half the time, and the rest of the time he would spend with his grown children, and "wander about." He had no property or income except his pension as a veteran of the Civil war, which amounted to $50 a month until he became an octogenarian and it was increased to $72. Defendant's worldly possessions consisted of a 5-room house and lot on Congress street in South Haven, where she lived with and cared for her aged mother, said by her attorney to be 90 years old, but who had passed away not long before this case was heard. Plaintiff states in his bill this property is worth $2,000. Defendant reduces it in her answer to $1,500 and in her testimony cuts it down to "$650."

Plaintiff had formerly lived in South Haven. When and how long is not shown, but defendant testified that she used to know him at that time "years ago, * * * when we were younger." He had apparently drifted back to South Haven on one of his furloughs from the Soldiers' Home, and she observed that "in the summer he worked there painting and cutting some lawns," including her own. She also said he "came to the house three different times or more and courted me before we were married." Asked as to who initiated his calls, she said: "I asked him before he came to my house."

Their courtship, thus initiated, resulted in the marriage at issue here, following which, pursuant to previous understanding, he went to live with his wife in her home as the man of the family, which consisted of his mother-in-law, wife, and himself. He found his mother-in-law a congenial member of the household, whom he describes as a "nice old lady," but occasional dissensions between himself and wife resulted, after they had lived together for six months, in an apparently amicable agreement to settle their domestic relations by his paying her $100 and leaving. They went together to an attorney of South Haven and had him draw up an agreement of separation, dated July 2, 1924, which recited that they had agreed to separate and no longer continue their marriage relations, and in settlement of their property interests it was mutually agreed between them that he should pay her $100, in consideration of which she agreed to release him from future support or claim on his pension. He agreed to release her from any claim on all household furniture and belongings which she had at the time of the marriage or they had acquired since, except his personal effects which he was at liberty to remove, with the concluding statement:

"It is understood and agreed this separation is by

mutual agreement and without ill-will on the part of the parties."

They executed the instrument in the presence of the attorney, who signed as a witness, and certified that the $100 was paid her in his presence.    They left the attorney's office together.    Plaintiff then packed his grip and transferred his habitat to the Soldiers' Home in Grand Rapids.

While the trial court condemned this agreement as "not within good conscience," and "never ought to have been drawn," neither of the parties themselves appears to have so regarded it.    The attorney who drew it was a reputable practitioner, acting impartially for both.    Although the parties were in correspondence when plaintiff was absent, and had periodically lived together until shortly before this bill was filed in 1926, she never repudiated or made any complaint in regard to this agreement, and both testify it was never mentioned between them.    She gave the name and residence of the attorney who drew the agreement, and said they went together to his office.    When asked: "Whose lawyer was he, yours or your husband's?" she replied: "We didn't care which one."    Evidently she did not, for she then secured her $100 and had an anchor to the windward which was not mentioned in the agreement.    She evidently knew and kept in reserve the fact that plaintiff wished to return and live with her.    She repeatedly testified that:

"He kept wanting to come.    *    *    *    He wrote it several times that if I would take him back he would be good to me and treat me different.    *    *    *    And he knows he always wants to come back, too."

He first returned with her permission in June, 1925, and remained about a month.    Of his next return she testified:

"On September 6, 1925, I fell into the cellar and then I telegraphed him for aid, and he came home and stayed until the 6th of December. He paid my doctor bill, five dollars, and then two dollars. That is not the occasion on which he paid my hospital bill. On the occasion I fell into the cellar he paid the doctor bill and got the groceries."

Of the hospital bill he said:

"When she had this hospital bill she wrote to me and said she was in hard circumstances and wanted me to come, and I went and got a month's provisions and I give her $25.

"Q. Had you been writing her to come back then?

"A. I never wrote to her only just in this way; I says, 'If you get through with this grandson, I will come and support you and your mother like I always did.'"

The testimony of these old people as to their domestic differences is not only irreconcilable in most respects, but that of each is often self-contradictory, confusing as to dates, places, and circumstances, and, as directed to their personal controversies, often runs to improbable extremes. Even how many times he returned and left on his own volition or at her mandate is not made clear. It seems fairly indicated he left and returned at least three times. He does not make it plain, while she once testified "seven or eight times." When asked later, on cross-examination, she replied: "I couldn't tell." She did say, however,

"When he would go away he would give me some money and get provisions sometimes. * * * When he was there he got what stuff, the like of groceries, each time he got his pension. He did not always buy a whole month's provisions."

Their reciprocally alleged extreme cruelty consisted chiefly of profane and vulgar language directed against each other in the heat of their quarrels, carried to a disgusting extreme which may not be detailed, vigor-

ously charged and vehemently denied by each. Their testimony is not indicative of a high degree of refinement or mentality.

Summed up, as near as we can gather from the rather confusing testimony, plaintiff's grievances against his wife consisted of her nagging him, spending certain of the money he gave her on her relatives, wanting him to sign a note to finish paying for an automobile bought by her daughter and taking sides with her grandson against plaintiff when differences arose between them; while her grievances against him seem to have been his "dirty temper," and disposition to find fault with and vocally abuse her over things which irritated him for which she was not to blame, including his differences with her grandson, whom plaintiff claimed was the large fly in their domestic ointment and the cause of his last hegira. He repeatedly insisted that they could have gotten along all right together except for the grandson's conduct around their home. The latter was a married man living elsewhere, engaged in truck driving. Plaintiff claimed that he assumed a dictatorial attitude around his grandmother's premises, used the place as a truck yard, dumping loads of gravel on the garden and lawn, and dirtied up the premises generally; that when plaintiff protested he replied insultingly, told him to shut up, and threatened to "break me in two." When he complained of this to his wife she took sides with her grandson, and in the last quarrel which they had she ended the matter by boarding the truck and riding away with the grandson, leaving plaintiff in a situation where he deemed it advisable to pack his grip and go. Following that irritating episode, he went to a lawyer on his return to Grand Rapids and filed this bill for divorce. Just how long it took his counsel to prepare the bill and have it served is not shown, but during that time plaintiff wrote an af-

fectionate and conciliatory letter to defendant, indicating a desire to adjust their differences and resume marital relations. It so happened that she received the letter on the same day process was served upon her in the divorce proceeding. Whether of any significance, it appears that not long after process was served there was a substitution of attorneys for plaintiff. She did not answer his letter, but secured counsel and answered his bill with a cross-bill asking affirmative relief.

Apparently neither of these parties was really anxious for a divorce. When confronted with the letter he wrote defendant after employing counsel to file a bill for divorce, plaintiff did not deny it but gave somewhat evasive answers, complaining of her grandson's conduct around their home.

When defendant's counsel opened the defense, he stated, in reply to an inquiry by the court:

"We are asking for affirmative relief on a cross-bill. The only thing this woman wants is somebody to furnish her support."

On her cross-examination, she was asked by plaintiff's counsel and answered, in part, as follows:

"*Q.* Your purpose in filing a cross-bill is to get part of Mr. Rice's money, his pension money to support you with?

"*A.* I don't know. Hadn't he ought to support me? He is my husband.

"*Q.* I am asking you, is that why you filed a cross-bill?

"*A.* Well, he had no reasons to sue me for a divorce.

"*Q.* Did you?

"*A.* No, he had no reasons to get a divorce. I don't want any divorce.

"*Q.* You don't want one, you don't want any divorce now?

"*A.* No.

"*Q.* And you didn't file a cross-bill for that purpose, either, did you?

"*A.* Yes, I wanted support.
"*Q.* And have a divorce from him?
"*A.* No, I don't want a divorce, but I want support."

When both parties rested, the court expressed the view that plaintiff was not entitled to a divorce, and remarked as to defendant, among other things:

"She testifies on the witness stand she doesn't want a divorce.   I have never granted a divorce to a person who did not want it.   *   *   *   The pleadings in the case pray for a divorce or rather the cross-bill of the defendant, the wife, but she says she don't want it. Under the circumstances there is something wrong. *   *   *   I anticipate from what appears in court here that counsel for defendant and defendant have not agreed upon the fact whether or not she is supposed to be asking for a divorce here," saying to her counsel: "You have a right to ask her and find out."

Her counsel was thereupon allowed to interview her privately, after which he recalled her to the witness stand.   She then said, in answer to leading questions, that she did want a divorce and alimony for her support, and "attorney fees to pay the costs of this proceeding."   On cross-examination, she was asked and answered, in part, as follows:

"*Q.* I asked if you thought of a divorce for you, if you had reasons for one, and you said no.   What did you mean by that?
"*A.* I don't remember what I said.   I am hard of hearing.   I have been doctoring with my ears.
"*Q.* Do you think right now Mr. Rice has done enough to make you think that you should have a divorce?
"*A.* Sure he did."

The court, after commenting upon the situation, granted defendant a decree with alimony as heretofore stated.

We find no occasion to disagree with the expressed impression of the trial court that it was plaintiff's "pension that made him look attractive to her when

he asked her to marry him," but we are unable to agree with the conclusion that she has established her right to a divorce by a preponderance of the evidence. We cannot conclude that either one of these old people is as bad as the other has asserted under the inspiration of a lawsuit. Since this suit was commenced he has written her asking reconciliation. She asserted and reiterated upon the witness stand, until privately interviewed by her counsel, that she did not want a divorce, but support. When off their guard each spoke at times favorably of the other.

This is one of those cases where in their comparatively petty quarrels each was irritating and more or less at fault. There is testimony given by each to support his or her claim of extreme cruelty. While both testify in the superlative, we are of opinion that, with due allowance for their mutual exaggeration, their stories show both at fault and neither entitled to any relief in a court of equity under the pleadings and proofs before us. In passing upon their testimony, we cannot adopt any rule of comparative extreme cruelty. In that respect the case falls well within *Radzinski* v. *Radzinski*, 234 Mich. 144, and authorities there cited. The bill and cross-bill must be dismissed.

Plaintiff commenced this litigation, seemingly as an auxiliary to his contemporaneous effort at reconciliation, then evidently unknown to his counsel. But whatever his vagaries were in that paradoxical reaction, he has not established his right to the relief he asks in the bill his counsel formulated for him. Defendant is awarded costs against him with an additional solicitor's fee of $50.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.